***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman. The appealing parties have shown good grounds to amend the prior Opinion and Award. Accordingly, the Full Commission AFFIRMS the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a pretrial agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The date of the injury, which is the subject of this claim, is August 21, 1998.
2. On such date, the parties hereto were subject to and bound by the provisions in the North Carolina Workers' Compensation Act.
3. On such date, the employer-employee relationship existed between decedent and defendant-employer.
4. On such date, defendant-employer employed three or more employees.
5. On such date, the defendant was self-insured and the administrator of workers' compensation insurance in North Carolina for the defendant-employer was Sedgwick of the Carolinas.
6. Decedent died on August 24, 1998.
7. Decedent was married to Maria C. Boney at the time of his death.
8. Maria C. Boney is the only whole dependent pursuant to N.C.G.S. § 97-38.
9. In addition, the parties stipulated into evidence the following:
 a. I.C. Forms 19, 61, 33, 18, 33R, 33 (September 8, 2000) and 33 R
(September 12, 2000).
b. A packet of medical records marked as Exhibit 1.
 c. Exhibits 2 through 7 and 9 through 13 as designated in the Pre-Trial Agreement.
10. The Pre-Trial Agreement dated January 2, 2001 which was submitted by the parties is incorporated by reference.
11. The depositions of Jacqueline Adkins, Dr. James Lewis Maynard, Douglas Paul McKown, Dr. Alfred Jackson Rufty, Dr. Richard A. Shugoll, and Dr. J. Michael Sullivan are a part of the evidentiary record in this case.
 ***********
Based upon the evidence of record, the Full Commission adopts the findings of fact found by the Deputy Commissioner with minor modifications as follows:
 FINDINGS OF FACT
1. On August 21, 1998 decedent, who was eighty-one (81) years old, was employed by defendant on a part-time basis as a fruit and vegetable inspector. Decedent had previously worked for defendant in that capacity on a full-time basis until he retired in 1988. After decedent's retirement, he would fill in for vacationing or absent employees working some days every month resulting in a fluctuating work schedule.
2. Decedent worked in a large refrigerated warehouse with a concrete floor. The temperature in the warehouse was kept at approximately 40 degrees Fahrenheit; so, decedent wore a bulky insulated coat for warmth while working. Decedent's job involved opening crates of produce which were stacked on pallets and examining samples of the fruits or vegetables inside the crates to ensure they met the company's quality criteria for sale to the public. Decedent was not required to inspect the produce in every crate on a pallet but would have to check a representative sample; so, he would often move a crate from the top row in order to check one below it.
3. On August 21, 1998, decedent was inspecting a pallet of green beans. The crates were stacked approximately waist high on this pallet. While checking some of the green beans in one of the top crates, decedent's left hand apparently began to cramp and draw up. Decedent used his right hand to lift his left hand, but then lost consciousness. A co-worker found decedent lying on the floor with the pallet next to his right side. No one had seen decedent fall. Decedent was still unconscious when the ambulance arrived and he was combative when emergency personnel attempted to put him on a stretcher. During the ride to the hospital, decedent began to slowly regain consciousness.
4. Decedent was conscious but nervous when his wife, Maria Boney, arrived at the hospital. Decedent was taken out of the emergency room on multiple occasions for testing. While decedent waited in the emergency room, he complained of pain in his right side under his armpit. Mrs. Boney advised a nurse of the complaint and assumed that it was taken into consideration. However, Mrs. Boney never saw or spoke to the doctor or doctors who were involved in the evaluation of decedent.
5. Decedent was admitted to the hospital with potential impressions of syncope versus seizure, hypoxemia, possible but doubtful pulmonary embolism, possible dysrhythmia and heart disease, and a possible neurological problem. Decedent's initial cardiac enzymes were normal but his EKG was non-diagnostic due to a left bundle branch block. Subsequent testing revealed an increase to 3.7 in decedent's cardiac Troponin I enzyme; consequently, Dr. Shugoll, a cardiologist, was consulted. Dr. Shugoll noted that decedent's oxygen saturation remained low. Among the tests Dr. Shugoll ordered was a ventilation perfusion scan. Decedent was also placed on aspirin to reduce his blood clotting ability.
6. The ventilation perfusion scan was performed on decedent on August 22, 1998 and showed a relatively low probability of a pulmonary embolism; however, there was an indication of some fluid in the base of decedent's right lung. Although decedent's chest x-ray films were substandard because he had not taken a deep breath, there was also evidence of pleural effusion on the x-rays. Decedent also underwent a CT scan of the brain to rule out a stroke, and no significant acute abnormality was identified.
7. With the test results available on August 22, 1998, Dr. Shugoll concluded that decedent had sustained a mild heart attack and he prescribed Heparin, an anticoagulant, for decedent.
8. Mrs. Boney and her son visited decedent on Saturday, August 22, 1998. Decedent continued to complain of pain in his right side and would wince when he moved in the bed. Nevertheless, decedent communicated freely with them and had no further episodes of loss of consciousness. As of Sunday evening, decedent felt well enough to joke with friends and was expressing relief because he expected to be released from the hospital following a cardiac catheterization the next day.
9. At 3:00 a.m. Monday morning, August 24, 1998, decedent was noted to be agitated and disoriented and his oxygen saturation continued to be low. Despite additional oxygen by cannula, decedent became increasingly agitated and upset. At 4:00am, a nurse called Dr. Shugoll who ordered a sedative. In addition, decedent was given a narcotic pain medicine that morning, but there was no notation regarding his complaint. As well, decedent was also placed in a restraint. Decedent's condition continued to deteriorate and his blood pressure dropped. Decedent was also noted to be pale and clammy. However, the only apparent treatment provided to decedent was an increase in the oxygen flow rate.
10. When Mrs. Boney arrived in decedent's hospital room on August 24, 1998, at approximately 8:30am, decedent was clearly in distress and said that he could not breathe. Decedent was still tied to the bed with a vest-like restraint. Mrs. Boney immediately went to the nurses' station to ask what had happened to decedent overnight since his condition was so serious, and she insisted that the restraint be removed. A nurse did remove the restraint from decedent and increased the oxygen flow, but no further assistance was provided despite repeated requests. Decedent died in a short time later. Mrs. Boney was furious at that point, asked the nurses what they were going to do now that her husband had died, and watched them call a code and run into his room before she left the hospital.
11. Approximately an hour later, Mrs. Boney returned to the hospital and was advised that decedent had died of a massive heart attack. Mrs. Boney did not believe the report and asked for an autopsy. The hospital was less than anxious to have an autopsy performed and, after various delaying efforts, finally quoted an exorbitant price. Consequently, Mrs. Boney contacted the coroner in York County, South Carolina, where she lived and arrangements were made for an independent autopsy by a forensic pathologist.
12. Dr. Maynard performed the autopsy on August 25, 1998 with Doug McKown, the coroner, as his assistant. By this time, Dr. Shugoll had prepared a death certificate showing the cause of death as cardiac arrest due to a myocardial infarction. Dr. Maynard quickly discovered that decedent had a huge blood clot in the pleural cavity of his right lung involving 1500 ccs of blood and 600 ccs of non-clotted blood in his chest cavity. Decedent's lung was collapsed. Further inspection revealed that decedent had five fractured ribs, two of which extended through the pleura with disruption of the intercostal arteries. In contrast, there was no evidence that decedent suffered an acute myocardial infarction. Decedent had not died of a heart attack but had bled to death. Almost half of decedent's total blood volume was in his chest cavity. The rib fractures which had caused the bleeding in decedent's chest cavity were demonstrated by testing to have been two to three days old at the time of decedent's death, which was consistent with the time he fell at work.
13. With the results of the autopsy available, Mr. McKown contacted Dr. Sullivan, the medical examiner in Mecklenburg County. Dr. Sullivan conducted an investigation and subsequently voided the death certificate prepared by Dr. Shugoll. A new death certificate was filed stating that decedent had died of a hemothorax due to blunt trauma to the chest from the fall at work.
14. On August 21, 1998 decedent clearly sustained an injury by accident in the course of his employment with defendant. Decedent's employment contributed to his injury and death in that the presence of the pallet was a hazard for someone falling from a standing position. The edge of the pallet was approximately four inches high and was made of solid wood. Decedent's rib fractures were the result of his striking the pallet with his right side when he fell. The fact that decedent fell against the pallet constituted an unusual occurrence which interrupted his regular work routine. Decedent fell due to a syncopal episode; however, the likely cause for decedent's loss of consciousness that day was not established. There was some indication that decedent had had a very mild heart attack, but the autopsy findings were not consistent with that explanation. Furthermore, decedent's left hand symptoms immediately preceding the syncope were more consistent with a neurological problem such as a transient ischemic attack. Whatever caused decedent to lose consciousness and fall did not cause his subsequent death, however. Decedent died because he fell against the pallet so that he broke five ribs. Since the rib fractures were not diagnosed and since decedent was placed on anticoagulant therapy, decedent slowly bled to death as a result of the fractures; therefore, decedent's injury arose out of his employment and was the cause of his death.
15. Decedent died on August 24, 1998 as a proximate result of the injury by accident he sustained on August 21, 1998 at work.
16. At the time of decedent's death, he was married to and living with Maria Boney, his wife of twenty-three (23) years. Decedent had one adult child who was married and living independently. There were no persons dependent upon decedent for support besides his wife.
17. Decedent's average weekly wage calculated by the Industrial Commission pursuant to the Form 22 Statement of Days Worked and Earningsof Injured Employee that is a part of the evidentiary record in this matter is $194.88 resulting in a weekly compensation rate of $129.93.
 ***********
Based upon findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On August 21, 1998 decedent sustained an injury by accident arising out of and in the course of his employment with defendant-employer. N.C.G.S. § 97-2 (6); Taylor v. Twin City Club, 260 N.C. 435 (1963);De Vine v. Dave Steel Co., 227 N.C. 684 (1947).
2. Decedent's death on August 24, 1998 was a proximate result of his injury by accident on August 21, 1998. N.C.G.S. § 97-2 (6); N.C.G.S. § 97-38; Click v. Pilot Freight Carriers, Inc., 300 N.C. 164
(1980).
3. Maria Boney, widow, was the only the person who was wholly dependent upon decedent at the time of his death, and she is therefore the only person entitled to compensation for his death. N.C.G.S. §97-38; N.C.G.S. § 97-39.
4. Decedent was engaged in part-time employment. A part-time job or intermittent part-time job shall not be converted to a full-time or continuous job when calculating the average weekly wage. Joyner v. A.J.Carey Oil Co., 266 N.C. 519, 146 S.E.2d 447 (1966). Consequently, decedent's average weekly wage of $194.88 yields a weekly compensation rate of $129.93 payable to decedent's only dependent, Maria Boney, for four hundred (400) weeks beginning August 24, 1998. N.C.G.S. §§97-2(5), 97-38.
5. Decedent is entitled to have defendant provide all medical compensation arising from this injury by accident. However, the evaluation and treatment of decedent's underlying condition, specifically any heart or neurological problems, is not compensable and defendant is not responsible for payment of those medical expenses. N.C.G.S. §97-2(19); N.C.G.S. § 97-25.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms in part and reverses in part the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Defendant shall pay death benefits to Maria Boney, widow, at the rate of $129.93 per week for four hundred (400) weeks beginning August 24, 1998. That portion of this compensation which has accrued shall be paid in a lump sum. This award is also subject to the attorney's fee hereinafter approved.
2. Defendant shall pay all medical expenses incurred by decedent as a result of this injury by accident, except that defendant is not liable for those expenses arising from evaluation and treatment of his underlying medical condition.
3. Defendant shall pay burial expenses not exceeding $2,000.00 to Maria Boney.
4. An attorney's fee in the amount of twenty-five percent (25%)of the compensation awarded is approved for plaintiff's counsel. Defendant shall pay him a lump sum from the accrued compensation and shall thereafter pay him every fourth check.
5. Defendant shall pay the costs.
This the ___ day of April 2002.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/______________ RENE C. RIGGSBEE COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER